**John H. MURPHY, Plaintiff,**

v.

**Millard C. FARMER, Jr., Alfred L. King, Jr., Larry King, P.C., Deborah L. Beacham, and My Advocate Center, Inc., Defendants.**

**CIVIL ACTION FILE NUMBER 3:15–cv–00092–TCB**

United States District Court, N.D. Georgia, Newnan Division.

Signed March 31, 2016

Wilmer Parker, III, Maloy Jenkins Parker, Atlanta, GA, for Plaintiff.

Deborah L. Beacham, Roswell, GA, pro se.

Millard C. Farmer, Jr., Office of Millard C. Farmer, Jr., John Colquitt Rogers, Carlock Copeland & Stair, LLP, Atlanta, GA, Mary Helen Moses, Mary Helen Moses, Esq, LLS, St. Simons Island, GA, for Defendants.

### *ORDER*

Timothy C. Batten, Sr., United States District Judge

This case comes before the Court on Defendants' motions to dismiss Plaintiff John H. Murphy's initial complaint [11, 13, 23 & 24]; Defendant Millard C. Farmer, Jr.'s motion to appoint a guardian ad litem [34]; Defendants' motions to dismiss Plaintiff's amended complaint [36, 37, 38, 40 & 41]; the motion to strike filed by Defendants Deborah L. Beacham and My Advocate Center, Inc. (together the "Beacham

Defendants") [39]; the motion to stay filed by the Beacham Defendants and joined by Defendants Alfred L. King, Jr. and Larry King, P.C. (together, the "King Defendants") [42 & 52]; Murphy's motion for entry of default against the Beacham Defendants [46]; and Murphy's motion to strike certain portions of the reply briefs filed by the Beacham Defendants and the King Defendants [60].

## I. Background

On May 21, 2015, Murphy filed this action for damages under the state and federal Racketeer Influenced and Corrupt Organizations ("RICO") statutes and state tort law. The acts alleged in the complaint arise out of a bitterly contested child custody battle that has been ongoing in the Georgia state courts. Murphy alleges that Defendants, as members of an enterprise led by Farmer, "have employed and continue to employ tactics in an illegal effort to extort payments, forced concessions, and other unjust benefits in exchange for, in Defendant Farmer's own words, 'restoring order' to the individuals victimized … by their illegal and unethically manufactured litigation chaos." [31] ¶ 4. According to Murphy, participants in Farmer's enterprise, referred to as the "Conflictineering Enterprise," include Defendants as well as Michelle Murphy (Murphy's ex-wife), Robert Hartman (Michelle Murphy's brother), Kimellen Tunkle (Farmer's assistant), T.B. (a minor child) and his mother, as well as other individuals.

The Court has attempted to summarize below the relevant allegations set forth in the 170–page amended complaint. For purposes of this summary, the Court assumes the facts set forth in the amended complaint are true. *See Pellitteri v. Prine,* 776 F.3d 777, 778 n. 1 (11th Cir. 2015).

## A. The Divorce and the Malpractice Action

In 2006, Murphy and his then-wife, Michelle Murphy, divorced. After the divorce they shared custody of their two children, who are referred to in the complaint as J.M. and T.M.

During the divorce proceedings, Michelle Murphy was represented by Delia Crouch. In December 2008, Farmer represented Michelle Murphy in a malpractice action against Crouch. In that action, Michelle Murphy claimed that Crouch had mishandled the equitable distribution of a pension, resulting in an alleged shortfall of approximately $50,000 to Michelle Murphy. In support of the complaint, King provided an affidavit expressing his opinion that Crouch had provided "substandard legal representation." [31] ¶ 37. Farmer paid King fees for his participation in the litigation.

In November 2010, Farmer moved to join Murphy as a defendant in the malpractice action. Murphy and his wife engaged in discussions with Farmer, but Farmer refused to accept the full amount in dispute to resolve the case. After Farmer threatened to make the case expensive and painful, Murphy and his wife "capitulated to Defendant Farmer's extortionate demands and paid him and Michelle Murphy $150,000" to resolve the case. *Id.* ¶ 41. Farmer and King became "acutely aware of the wealth of Mr. Murphy and his wife" as a result of the malpractice litigation. *Id.* ¶ 42.

## B. The Child Custody Proceedings

In 2011, Murphy became concerned about Michelle Murphy's custody of their children, and in April 2012, he filed an action in state court seeking to modify the child custody arrangement. (The Court will refer to the 2012 action filed in state court as the "child custody litigation.")

Farmer and King represented Michelle Murphy in the child custody litigation, with Farmer serving as lead counsel.

During the course of the child custody litigation, Farmer and King filed more than twenty motions to disqualify judges involved in the proceedings. In May 2012, Michelle Murphy filed an answer seeking an upward modification of child support. She also asserted "a patently frivolous and vexatious" third-party complaint against Murphy's current wife. *Id.* ¶ 47. This claim was filed "solely to place pressure on her to persuade her husband to abandon his child custody claims and to secure a large shakedown payment for Defendants Farmer and King." *Id.* ¶ 12.

Shortly after filing the third-party claim, King contacted Murphy's current wife to resolve the dispute raised in the third-party complaint against her. King proposed to "privately discuss the core dispute and resolve this matter outside the courtroom." [31] ¶ 49. King wrote, "My plan is simple, I have [Defendant Farmer's] ear and he has the ability to develop a plan acceptable to Michelle." [1–3]. King again reached out to Murphy's wife about a week later and proposed a private meeting saying, "My role in this litigation is a lot different from Mr. Farmer's. Mr. Farmer is a litigator. He only knows excessive litigation." [31] ¶ 50 (emphasis omitted). Murphy alleges that "[t]he clear message conveyed" by King was that if Murphy's wife did not persuade her husband to abandon his claims in the child custody litigation and settle, "they would be faced with escalated 'excessive litigation' at the hands of" Farmer, who they knew would take unreasonable positions as he had done in the malpractice litigation and would file frivolous defamatory submissions as he had done with his motions to recuse the state court judge. *Id.* ¶ 51.

Murphy's wife declined King's offer to discuss a resolution.[1]

Murphy later amended his complaint, and in response Michelle Murphy filed an amended third-party complaint that was "replete with abusive, impertinent material, and fixated on the purported financial means and assets of" Murphy and his wife. *Id.* ¶ 54. Murphy alleges that such allegations confirm "the Conflictineering Enterprise's focus upon the assets they could target for themselves." *Id.* ¶ 55. Murphy also alleges that throughout the litigation, Farmer and King used motions and appeals to delay adjudication of the merits of Murphy's claims and intimidate participants in the litigation.

## C. Attacks on Guardians ad Litem and Evaluators

Murphy alleges that King and Farmer "engaged in systemic attacks" against the individuals appointed to serve as a guardian ad litem ("GAL") for the children. After protesting the appointment of and refusing to pay for a GAL, Farmer and the enterprise "undertook to intimidate, harass, and badger the first GAL," and as a result of these attacks she withdrew within two months of being appointed. *Id.* ¶ 65. In June 2012, a new GAL was appointed, and Farmer and King filed a "baseless and malicious" motion to disqualify her. *Id.* ¶ 66. The court denied their motion; they appealed; and the court of appeals ruled that the appeal was frivolous, imposing the maximum sanction available.

Farmer insisted upon the involvement of Dr. Patricia Nice, the children's treating psychiatrist, but he failed to disclose to the court that he had previously represented Dr. Nice free of charge in connection with several employment-related matters. Farmer arranged a meeting with Dr. Nice

1. On January 11, 2013, the third-party claim against Murphy's wife was dismissed.

before a court hearing, and during that meeting he informed her that he expected her to support Michelle Murphy in her position in the child custody litigation. Dr. Nice informed him that she found it difficult to do so, but Farmer refused to accept Dr. Nice's view. Based on her observations of Farmer's prior behavior, she "reasonably feared that he expected her to suppress" any evidence or information that would put Michelle Murphy in a negative light, and she understood that "Farmer would seek to 'destroy' her publically, professionally, and personally if she" did so. *Id.* ¶ 76. Murphy alleges that as a result of Farmer's influence and intimidation, Dr. Nice did not provide any testimony at the hearing that was harmful to Michelle Murphy's interests.

Farmer then pushed to get Dr. Nice more involved with the litigation. Murphy avers that Farmer anticipated that Dr. Nice would capitulate to his threats and refuse to recommend a full custody evaluation, but Dr. Nice, along with psychologist Tony Johnson, Ph.D., issued a joint letter to the court recommending a full custody evaluation. Farmer and King filed a frivolous appeal to delay the court's decision regarding the evaluation. In the meantime, at Farmer's urging the children stopped attending their appointments with Drs. Johnson and Nice and became alienated from Murphy and his current wife.

### D. Attempted Intimidation of Witnesses

In August 2013, Farmer engaged in several attempts to intimidate witnesses involved in the proceedings. Murphy submitted the affidavit of Bryan McLendon, who had rented a room to Michelle Murphy and provided transportation for the children. In his affidavit McLendon detailed disturbing conduct of Michelle Murphy and hazardous incidents involving the children. Shortly after the affidavit was filed, Farmer contacted McLendon, who

was a former client of Farmer's, "for the overt purpose of threatening him with imprisonment, intimidating him, and pressuring him to recant his sworn testimony against Michelle Murphy." *Id.* ¶ 90.

Murphy also alleges that Farmer issued threats to Dr. Johnson and Dr. Nice to intimidate them and influence their testimony. Farmer represented to Dr. Johnson that he would cause difficulties with Georgia state licensing authorities if Dr. Johnson testified negatively against Michelle Murphy. Similarly, Dr. Nice feared that Farmer would create similar problems for her and that he would use against her sensitive personal information that he obtained during the course of representing her. Days before the hearing, Farmer contacted Illinois licensing authorities to obtain written information regarding Dr. Nice's license status. In furtherance of a good cop/bad cop technique, King intercepted Dr. Nice on her way into the courthouse for a hearing, and using a calmer approach he sought a preview of Dr. Nice's testimony and attempted to influence and shape that testimony.

Dr. Nice still testified about her concerns for the children, and the court ordered the parties to submit to a full custody evaluation by Dr. Nancy McGarrah. After her testimony, Farmer filed a series of briefs revealing personal information regarding Dr. Nice. Despite the court's order, Michelle Murphy refused to participate in the custody evaluation.

In September 2013, Farmer attempted to intimidate Dr. McGarrah and dissuade her from serving as custody evaluator. Specifically, Farmer wrote a letter demanding various information from her and asking her irrelevant and inappropriate questions about the pleadings and orders in the case. Dr. McGarrah acknowledged receipt in a letter copying Murphy's counsel. Farmer then sent Dr. McGarrah an-

other letter attacking her for disclosing his prior letter and threatening to contact the APA Ethics Committee.

### E. The Contempt Order and Other Intimidation

In the meantime, Murphy filed a motion for contempt against Michelle Murphy based on her failure to cooperate with the custody examination and statements by the children indicating that Farmer and Michelle Murphy were discussing the case with the children in violation of a court order. Farmer and Michelle Murphy did not appear at the contempt hearing, and the court found Michelle Murphy, Farmer, and King in contempt of court as a result of Michelle Murphy's refusal to cooperate in the custody evaluation, the discussions that she and Farmer had with the children, and Farmer and King's direction that she not appear at the hearing. They appealed the order, and the court of appeals held that Farmer and King could not be held in contempt for Michelle Murphy's failure to appear at the hearing but otherwise confirmed the contempt order against Michelle Murphy and Farmer.

Michelle Murphy continued to refuse to cooperate with the custody evaluation, and Farmer and King filed a frivolous motion to disqualify Dr. McGarrah as custody evaluator. Murphy then filed a motion for a mental examination of Michelle Murphy, which the court granted. After the hearing on that issue, Farmer sent Dr. McGarrah another letter intended to intimidate her, indicating that Michelle Murphy would not participate in any examination in which Dr. McGarrah might be shielded from liability. The day after receiving this letter, Dr. McGarrah moved to withdraw as the custody evaluator and the psychiatrist appointed to conduct Michelle Murphy's mental examination. The court subsequently appointed Dr. H. Elizabeth King as the new evaluator.

### F. Murphy Is Awarded Temporary Custody and the Enterprise Reacts

In May 2014, after a hearing the court awarded temporary custody of the children to Murphy. Despite a court order prohibiting her from having any contact with the children, Michelle Murphy continued to contact them numerous times a day. At Farmer's direction, she instructed the children to resist Murphy's efforts to take their mobile phones away and to use any such effort as a pretext for an altercation.

In June of 2014, Murphy tried to take T.M.'s mobile phone away, and when T.M. resisted, he scraped one of his lips against his braces. Michelle Murphy instructed the children to get photographs to send with a message that Murphy caused the injury. The next day, Farmer and King filed a court document representing that Murphy had abused T.M.

That same day, Michelle Murphy communicated with J.M. that she had a plan to get him out of Murphy's home. Shortly after that, J.M. ran away from Murphy's residence in St. Thomas in the U.S. Virgin Islands. Murphy believes that Michelle Murphy and/or Farmer encouraged J.M. to run away. J.M. spoke with Michelle Murphy and Farmer during the time he was missing. Murphy avers that one or both of them directed J.M. to demand that Murphy state in writing that he agreed the children would be better off with Michelle Murphy in Newnan, Georgia. At the demand of J.M., as instructed by Michelle Murphy or Farmer, Murphy sent J.M. a text message saying, "I will work with you to get you back to Newnan." *Id.* ¶ 155. In her communications with J.M. the following day, Michelle Murphy asked if a flight had been scheduled and referenced the prior day's events as involving "negotiations," a "deal," and "ransom." *Id.* ¶ 158.

At almost the same time he discovered J.M. was missing, Murphy received a visit from a representative of the U.S. Virgin Islands Department of Human Services who stated that she had received a report of child abuse filed by Farmer. As a result, Murphy was unable to leave and immediately search for J.M. After investigating, the representative did not find any evidence to support the allegations.

## G. Attempted Bribery and Intimidation

Also in June 2014, Farmer and King embarked upon a scheme to attempt to bribe the judge in the child custody litigation by threatening and filing frivolous litigation against the judge's court reporter, Nan Freeman. Farmer sent Freeman a series of emails demanding that she provide him with audio tapes of hearings in the child custody litigation. The judge subsequently agreed to make them available to Farmer, but Farmer used the threat of a lawsuit to demand that he receive his own personal copy of the recording. The judge ultimately agreed to this, but Farmer and King had already filed a lawsuit against Freeman and her business the day before. Farmer contacted Freeman's attorney shortly after he appeared in the case and said that he would dismiss the case if Freeman persuaded the judge in the child custody dispute to recuse himself and vacate his ruling granting temporary custody to Murphy.[2] Freeman and her attorney declined, and Freeman ultimately prevailed in the litigation.

At the same time they filed their lawsuit against Freeman, Farmer also demanded the initiation of a criminal investigation of Freeman for allegedly overbilling the counties to which she provided services.

The Cobb County district attorney's office investigated and found the allegations to be without merit.

Michelle Murphy also threatened Dr. Johnson around the same time. On June 22, she approached him at the Newnan Target store and began harassing him in the checkout line, saying that he was the reason she lost custody of her children. After he left the line, Michelle Murphy followed him and stated that she was going to "take him down." *Id.* ¶ 174.

## H. The Enterprise Seeks Evidence Against Murphy and Begins Social Media Campaign; King Retires

In the summer of 2014, Michelle Murphy also met with a minor friend of the children, T.B., to develop a scheme whereby T.B. would travel to the Virgin Islands to visit the children and attempt to manufacture false evidence that Murphy was abusing the children so that the enterprise could raise additional claims of child abuse. During a visit, T.B. enticed the children to engage in delinquent and criminal acts. Among other things, he urged them to steal and consume alcoholic beverages, persuaded them to purchase and manufacture marijuana pipes, and helped them roll "blunts" consisting of marijuana mixed with cigar tobacco. T.B. remained in contact with Michelle Murphy, and King and Farmer filed an emergency motion for relief alleging that the children were consuming alcohol and drugs. Farmer met with T.B. upon his return, and Farmer and King filed an amendment to their emergency motion expanding their allegations.

On August 26, 2014, King suddenly moved to withdraw as co-counsel for Michelle Murphy, indicating that he was re-

---

**2.** Murphy also alleges that Farmer threatened to file similar litigation against the court reporter in the Nan Freeman litigation if she did not provide audio recordings of that litigation.

tiring. On September 10, the court granted his motion. Murphy avers that King foresaw the continuing activities of the enterprise to extort money from Murphy and his wife and to pressure Murphy to abandon his claims in the child custody litigation. "Nevertheless, Defendant King did not take any action to disavow or defeat the objectives of the" enterprise. *Id.* ¶ 188. Murphy therefore asserts that King did not withdraw from the enterprise.

In August of 2014, Hartman and perhaps other members of the enterprise trespassed onto Murphy's property in St. Thomas to give the children new cell phones and deliver J.M. a "runaway kit." *Id.* ¶ 189. Around the same time, Michelle Murphy and other members of the enterprise launched a social media campaign to bring additional pressure on Murphy to relinquish his claims and pay off the enterprise. Shortly after that, the Beacham Defendants joined the enterprise to further the objectives of the enterprise and their own closely related objective of increasing the profile and profitability of My Advocate Center.

### I. The Beacham Defendants' Scheme to Defraud

Beacham owns and operates My Advocate Center. She is not a licensed attorney or social worker and has no training in psychology. Her involvement in family matters arises from her own divorce.

In 2011, Beacham began operating My Advocate Center. According to the organization's website, it offers an array of tools and resources to assist parents and professionals in custody disputes. The website states that it "offers a collection of experts and resources to give individuals a way to know they are on the right path and in good hands when entering into or navigating through a legal conflict," and it refers to the skill and experience of the organiza-

tion's "team" and its advisory council. *Id.* ¶¶ 205, 209. The website also refers to the organization as having analysts and legal counsel, and it promises to refer parents to "M–A–C–Qualified Professionals." *Id.* ¶ at 207. It urges litigants to consult with the organization before filing or if they have just hired an attorney.

Murphy alleges that the representations on the My Advocate Center website are false. He avers that My Advocate Center does not have a team of experts or an advisory council, and in fact Beacham operates My Advocate Center as a "one-woman shop" that does not provide any legitimate support services. *Id.* ¶ at 204. According to Murphy, Beacham has served as the only full-time employee of the organization, and "Rebecca Bennett," the only other employee listed on the website, is an alias for Beacham. He alleges that the only service provided by My Advocate Center is "the dissemination of false accusations by disappointed family court litigants." *Id.* ¶ 214.

My Advocate Center offers services for a consulting fee. The website also solicits donations. Murphy alleges that Beacham operates My Advocate Center as a scheme or artifice to defraud whereby she entices clients and donors "to line her own pockets by holding My Advocate Center out as a legitimate organization providing case management services to child custody litigants." *Id.* ¶ 219. Murphy avers that the Beacham Defendants viewed the child custody litigation as "a prime opportunity to enhance the profile of My Advocate Center."

### J. Kidnapping and Dissemination of False Statements

On or before August 29, 2014, with the knowledge and support of other members of the enterprise, Beacham traveled to St. Thomas. There, she enticed the children

to sneak off Murphy's property and get into the back seat of a waiting van. Beacham then engaged the children in a heavily-scripted videotaped interview, asking the children highly leading questions with the "obvious purpose" to "elicit false or distorted allegations of child abuse or other alleged misconduct" by Murphy. *Id.* ¶ 195. The enterprise intended to use this video to further pressure Murphy into giving up his child custody claims and making "a shakedown payment to terminate the continuing terroristic attacks and deliberate endangerment of the Children." *Id.* ¶ 196. The enterprise showed portions of Beacham's interview with the children at town hall meetings organized and conducted by Farmer, Michelle Murphy, and Beacham. Portions of the video were also posted to My Advocate Center's website.

In September 2014, members of the enterprise posted on social media detailed information about the children and about Murphy and his wife that according to Murphy made them an attractive target for kidnapping. Around the same time, they created false and misleading posts indicating that the children had been placed with Murphy as a result of purported bribery of judicial and quasi-judicial officials.

That month, members of the enterprise disseminated false and misleading statements through newspaper articles and town hall meetings. For example, the financial publication *FINalternatives* published an article regarding the child custody litigation after being contacted by Beacham. Farmer and Michelle Murphy made numerous false statements to the journalist, and the article quoted Michelle Murphy as saying that the children were being "held against their will" and "imprisoned." *Id.* ¶ 238.

On September 18, Farmer, the Beacham Defendants, and Michelle Murphy conducted a town hall meeting that was publicized through social media. At the meeting, Beacham claimed to have 200 cases in Atlanta and dozens more in Augusta. She also admitted that Michelle Murphy paid for her trip to the Virgin Islands, and she had agreed to tape the secret interview of the boys because Michelle Murphy would have been arrested for attempted kidnapping.

On September 23, Farmer, the Beacham Defendants, and Michelle Murphy held their second town hall meeting that was also "replete with false accusations against" Murphy, his wife, and others involved in the child custody litigation. *Id.* ¶ 253. Michelle Murphy and others also organized various pickets in Newnan, Georgia. Murphy avers that these activities were intended to bring additional pressure on Murphy and his wife to withdraw the child custody litigation and capitulate to the demand for attorney's fees.

In October 2014, Farmer and Michelle Murphy called the Tennessee Department of Children's Services and filed another false report of child abuse. Murphy and his wife were visited and questioned in their home in Chattanooga. Also in October 2014, as a response to a frivolous motion filed by Farmer, the state court entered an order prohibiting Farmer from filing further motions without its permission.

Murphy alleges that Michelle Murphy and other members of the enterprise have engaged in a social media campaign to disseminate false, defamatory statements. Among other things, they have accused Murphy and/or his wife of physically and emotionally abusing the children, abusing alcohol, engaging in bribery, witness tampering, and other illegal acts, using the children to secure tax advantages. Murphy also alleges that Beacham has made similar defamatory statements, through the My Advocate Center website, and using that organization to give the state-

ments greater credibility. In September 2014, Beacham posted statements that the children were "purchased in Georgia with the help of certain court professionals"; "silenced by custody experts paid to ensure the case turns out a certain way"; and "held against their will." *Id.* ¶ 270–71.

In March 2015, she posted another story. In that post, Beacham accused family court professionals of "trafficking" children, referred to "fraud and racketeering practices," referred to kids being "bought and sold," stated that "this mess and related damages could have been avoided if laws were upheld, and ethics rules and judicial canons upheld," insinuated that child custody experts were "known for abandoning abused children, falsifying reports, committing perjury, and participating in fraud," stated that "the court was using extortion tactics to force the mother to work with" the two doctors involved, and indicated that a law firm had been hired "to ensure that the trial court was not investigated for wrongdoing and that the higher courts did not get to learn that transcripts were incomplete and that fraud had occurred." *Id.* ¶ 272.

In January 2015, in a conversation with Murphy, Michelle Murphy stated that Farmer had told her that she owed him $500,000 and that the child custody litigation could not be resolved unless Murphy paid this to him. Murphy avers that when he and his wife refused to capitulate to the demand to pay Farmer $500,000, the enterprise intensified its defamatory attacks on Murphy and his wife by, among other things, making defamatory radio broadcasts.

The Beacham Defendants began a radio show known as "Pro Advocate Radio." In March 2015, they broadcast two shows in which they made numerous defamatory statements. Among other things, they falsely accused Murphy and others of participating in criminal acts and stated that it was "pre-arranged" for the children to be removed from Michelle Murphy. *Id.* ¶ 285. In response to a defamation retraction demand letter that Murphy sent to it, the radio station stated that Farmer had reviewed and confirmed the accuracy of the content and the facts prior to the show. In June 2015, the state court entered an order enjoining Michelle Murphy or anyone acting on her behalf from posting any information regarding the child custody litigation on the Internet.

### K. Murphy's Claims

Based on the foregoing facts, Murphy brings Georgia and federal RICO claims against all Defendants. Murphy alleges nine separate predicate acts in support of his Georgia RICO claims:

(1) attempted theft by extortion (in violation of O.C.G.A. § 16–8–16) "by unlawfully seeking to obtain payments and other property of or from" Murphy, "including the relinquishment of his custody claims and payment of excessive attorney's fees" through the actual and threatened commission of criminal offenses and the dissemination of false or negative information "designed to promote hatred, contempt, and ridicule," *id.* ¶ 333;

(2) attempted bribery of a state court judge (in violation of O.C.G.A. § 16–10–2) by offering to dismiss the lawsuit against Freeman in exchange for the judge's retroactive recusal from the child custody litigation;

(3) intimidation of a court officer (in violation of O.C.G.A. § 16–1097) by issuing threatening communications to and filing a lawsuit against Freeman and by making inflammatory accusations against a guardian ad litem in motions and on the Internet;

(4) influencing witnesses (in violation of O.C.G.A. § 16–10–93) by "threatening harm or damage to the property

or employment of witnesses" in the child custody litigation, including Dr. Nice, Dr. McGarrah, Dr. Johnson, Harwell, and McLendon, with the intent to deter them from testifying truthfully, *id.* ¶ 361;

(5) kidnapping and kidnapping for extortion (in violation of 18 U.S.C. §§ 1201 & 1952 and 14 V.I.C. § 1052) by enticing the children away from Murphy and detaining them while Beacham "used the children to manufacture false evidence in the" child custody litigation to intimidate Murphy and obtain extortionate payments, *id.* ¶ 402;

(6) filing a false report of child abuse via interstate wires (in violation of 18 U.S.C. § 1343, 14 V.I.C. §§ 2144(a) & 2146(c), T.C.A. § 37–1–413), through Farmer's filing of false reports of child abuse with authorities in the Virgin Islands and Tennessee;

(7) interference with custody (in violation of O.C.G.A. § 16–5–45), through the actions of Farmer and the Beacham Defendants in enticing J.M. to run away and later enticing the children away from Murphy so that Beacham could conduct her interview;

(8) wire fraud (in violation of 18 U.S.C. § 1343)[3] through Beacham's operation of My Advocate Center as a "scheme or artifice to defraud" for the purposes of soliciting clients and donations and conveying legitimacy in order to lend credibility to false accusations that are disseminated over the Internet to pressure parties, *id.* ¶¶ 432–33; and

(9) mail and wire fraud (in violation of 18 U.S.C. § 1343) through communications between King and Murphy's ex-wife to bring pressure on Murphy to relinquish his claims and pay the enterprise.

Murphy also brings claims for conspiracy to violate Georgia RICO, and he alleges that Defendants violated and conspired to violate the federal RICO statute. Murphy's federal RICO claims are based on the allegations of attempted theft by extortion, attempted bribery, kidnapping and kidnapping for extortion, filing a false report of child abuse via interstate wires, wire fraud, and mail and wire fraud listed above.[4] Finally, Murphy brings defamation claims against Farmer and the Beacham Defendants for defamatory statements made at town hall meetings, on the Internet, and through radio.

## II. Motion for Default Judgment

█ Murphy has moved for default judgment against the Beacham Defendants in light of their failure to file a timely answer or otherwise respond to the amended complaint. Murphy filed his amended complaint on August 5, 2015. Federal Rule of Civil Procedure 15(a)(3) provides that unless the Court orders otherwise, any required response to an amended pleading must be made by the later of the deadline for responding to the original pleading or fourteen days after service of the amended pleading.

Under the Federal Rules of Civil Procedure, Defendants were required to respond to the amended complaint on or before August 24, 2015.[5] However, the

---

**3.** In the complaint, Murphy references Section 1353, but as Defendants have pointed out, the wire fraud statute is codified at Section 1343.

**4.** For purposes of his federal claim, Murphy does not rely on intimidation of a court officer, influencing witnesses, or interference with custody.

**5.** Rule 6(d) adds an additional three days to

Beacham Defendants did not respond until August 25, when they filed their motions to dismiss. In those motions, the Beacham Defendants neither requested an extension of time to respond to the amended complaint nor explained their failure to timely respond. On August 31, Murphy pointed out that the Beacham Defendants were in default in his response to their motion to stay.

Federal Rule of Civil Procedure 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." However, pursuant to Rule 55(c), the Court "may set aside an entry of default for good cause." In this case, default has not yet been entered, but because the Court sees no point in granting default only to set it aside, it will look to the "good cause" standard in Rule 55(c) to determine whether to grant Murphy's motion.

The Beacham Defendants do not contest that their motions to dismiss were filed a day late, but they contend that the one-day delay in filing these motions does not warrant the entry of default. They explain that their counsel "inadvertently miscalculated" the due date for their responsive motions and was unaware that the motions were late at the time they were filed. [48] at 2. But they argue that they have not failed to plead or otherwise defend the action as required for entry of default, noting that they filed timely motions to dismiss Murphy's initial complaint and have participated in other aspects of the case, including the parties' initial discovery conference. They also note that Murphy has not shown or even alleged any prejudice resulting from their one-day delay in filing their motions to dismiss. *See Mitchell v. Brown & Williamson Tobacco Corp.*, 294 F.3d 1309, 1317 (11th Cir.2002) (concluding that exceptional circumstances to justify entry of a default judgment were not present where the defendant failed to file an answer but filed a motion to dismiss "a short time after the deadline for responsive pleadings"). Thus, they argue that their one-day delay in filing motions to dismiss is merely a "technical default" that "does not warrant the harsh sanctions sought by" Murphy. *Gresham v. Waffle House, Inc.*, 586 F.Supp. 1442, 1444 (N.D.Ga.1984).

Focusing on their reasons for the delayed filing, Murphy notes that it is well-established that "attorney error based on a misunderstanding of the law was an insufficient basis for excusing a failure to comply with a deadline." *Advanced Estimating Sys., Inc. v. Riney*, 130 F.3d 996, 998 (11th Cir.1997). Murphy cites several cases finding that an attorney's missed deadlines did not constitute "excusable neglect" to warrant, for example, an extension of time to file a notice of appeal or relief from a judgment. However, none of those cases appears to have involved the situation the Court is confronted with here.[6]

the response time when service is made by certain methods, including electronic transmission, and Rule 6(a)(2)(C) provides that if the deadline falls on a Saturday, Sunday, or legal holiday, the period continues to run until the next business day.

**6.** The Court might arrive at a different conclusion if it were confronted with a motion to set aside a default judgment under Rule 60(b), which permits a court to provide relief from a final judgment for "mistake, inadvertence, surprise, or excusable neglect." But here, the Court has not entered a final judgment against the Beacham Defendants, so the less rigorous "good cause" standard under Rule 55 applies. *See E.E.O.C. v. Mike Smith Pontiac GMC, Inc.*, 896 F.2d 524, 528 (11th Cir. 1990) ("The excusable neglect standard that courts apply in setting aside a default judgment is more rigorous than the good cause standard that is utilized in setting aside an entry of default.").

The Eleventh Circuit has recognized that " 'good cause' is not susceptible to a precise formula." *Compania Interamericana Exp.–Imp., S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir.1996). But courts have generally evaluated considerations such as "whether the default was culpable or willful, whether setting it aside would prejudice the adversary, and whether the defaulting party presents a meritorious defense." *Id.*

■ Here, the Beacham Defendants filed a motion to dismiss that was a day late. There is no indication that their mistake, or that of their counsel, was willful, and Murphy has not shown that he was prejudiced by this in any way. Further, the Beacham Defendants filed a timely response to Murphy's motion for default judgment explaining the reason for the late filing. Considering the circumstances and the fact that a default judgment "is a drastic remedy which should be used only in extreme situations," *Wahl v. McIver,* 773 F.2d 1169, 1174 (11th Cir.1985), the Court concludes that even if Murphy would be entitled to default based on the Beacham Defendants' delay in filing their motions to dismiss, they have shown good cause for setting aside any default. The Court will therefore deny Murphy's motion for default.

### III. Motions to Dismiss and Motion to Strike Reply Briefs

■ Pending before the Court are two separate sets of motions to dismiss—Defendants' motions to dismiss Murphy's original complaint and their motions to dismiss his amended complaint. "As a general rule, an amended complaint supersedes and replaces the original complaint unless the amendment specifically refers to or adopts the earlier pleading." *Schreane v. Middlebrooks,* 522 Fed.Appx. 845, 847 (11th Cir.2013) (quoting *Varnes v. Local 91, Glass Bottle Blowers Ass'n of U.S. & Can.,* 674 F.2d 1365, 1370 n. 6 (11th Cir.1982)). Because Murphy's amended complaint supersedes his original complaint, and Defendants have separately moved to dismiss the amended complaint, the Court will deny Defendants' motions to dismiss the original complaint as moot. *See Thomas v. Alcon Labs.,* 116 F.Supp.3d 1361, 1365 n. 5 (N.D.Ga.2013) ("[A] motion to dismiss is rendered moot by an amended pleading.")

Also before the Court is Murphy's motion to strike new arguments raised for the first time in reply briefs filed by the Beacham Defendants and the King Defendants. Murphy notes that both sets of Defendants presented in their reply briefs new arguments that they did not raise in their initial motions. Specifically, the Beacham Defendants challenge the "nexus" or causation between the alleged racketeering acts and Murphy's injuries.[7] The King Defendants raise new arguments that Murphy has not alleged an enterprise or that he has not sufficiently alleged the King Defendants' participation in an enterprise.[8] Murphy asks the Court to strike new arguments raised for the first time in the reply briefs. Alternatively, he requests leave to file a sur-reply. In response, the King Defendants and the Beacham Defendants do not dispute that they raised new arguments for the first time in their reply briefs. Instead, they ask the Court to permit the arguments in

---

**7.** They also note that for purposes of the federal RICO statute, injuries must be to business or property. *See* 18 U.S.C. § 1964(c).

**8.** Additionally, although Murphy did not refer to this in his motion, it appears to the Court that the King Defendants argue for the first time in their reply brief that Murphy has failed to plead the specific predicate acts of mail fraud and extortion.

their reply briefs and allow Murphy to file a sur-reply.

■ As an initial matter, the Court notes that a reply brief is not the proper subject of a motion to strike. Rule 12(f) permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A reply brief is not a "pleading" as defined by Rule 7(a). *See* Fed. R. Civ. P. 7(a) (narrowly defining "pleadings"); *see also Circle Grp., L.L.C. v. Se. Carpenters Reg'l Council*, 836 F.Supp.2d 1327, 1349 (N.D.Ga.2011) (noting that Rule 7(a) "applies to pleadings, not to motions or briefs filed in support of motions"). For that reason, the Court will not "strike" the new arguments in the reply brief.

■ However, the Court agrees with the substance of Murphy's argument. "It is common practice for the Court not to hear arguments raised for the first time in a reply brief." *Kelley v. Washington Mut. Fin. Inc.*, No. 1:11–cv–2497–RWS, 2013 WL 5530351, at *4 (N.D.Ga. Oct. 4, 2013); *see also Tafel v. Lion Antique Invs. & Consulting Servs.*, 459 Fed.Appx. 847, 849 (11th Cir.2012) ("The district court had no obligation to consider an argument raised for the first time in the reply brief.").

The King Defendants and Beacham Defendants have not offered any reason for their failure to raise their new arguments in their motions, and the Court is not inclined to consider them at this juncture.[9] However, Defendants may raise these arguments in a subsequent motion for judgment on the pleadings or a motion for summary judgment, as appropriate. The Court now proceeds to the arguments properly raised in Defendants' motions to dismiss Murphy's amended complaint.[10]

## A. Legal Standard

To survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir.2012). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. All well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir.2011), but the Court need not accept as true Plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

---

9. Although the Court does not encourage lengthy filings, it suspects that the issues raised in the reply briefs will require a more detailed analysis than can be provided in a few paragraphs of a reply brief and a fifteen-page sur-reply.

10. In several instances, the Defendants have adopted each others' arguments. The Court acknowledges this but addresses the arguments only once below.

## B. King Defendants' Motion to Dismiss

The King Defendants argue that the Court should dismiss Murphy's claims for several reasons. First, they contend that Murphy cannot show the pattern necessary to establish his federal RICO claims. Second, they argue that Murphy's state law RICO claims are precluded by O.C.G.A. § 51–7–85, which serves as the exclusive state-law remedy for abusive litigation. Alternatively, they assert that Murphy has failed to establish a pattern under Georgia law.[11] Finally, they argue that res judicata bars any claims addressed in the state court's contempt order or that the Court should dismiss the action under the prior action pending doctrine.[12]

### 1. Federal RICO—Pattern of Racketeering

■ The federal RICO statute "makes it unlawful 'to conduct or participate, directly or indirectly, in the conduct of [an] enterprise [that affects interstate commerce] through a pattern of racketeering activity.'" *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 948 (11th Cir.1997) (quoting 18 U.S.C. § 1962(c)). "[T]o state a prima facie civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must establish 'three essential elements': first, that the defendant committed a pattern of RICO predicate acts under 18 U.S.C. § 1962; second, that the plaintiff suffered injury to business or property; and, finally, that the defendant's racketeering activity proximately caused the injury." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014) (quoting *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991)). In their mo-

tion, the King Defendants challenge only the first of these elements, arguing that Murphy has failed to sufficiently allege a pattern of racketeering activity.

■ Congress has defined "racketeering" activity as a violation of the criminal statutes listed in § 1961(1). "To successfully allege a pattern of racketeering activity, [Murphy] must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). The King Defendants contend that Murphy's complaint does not satisfy the two-predicate-acts requirement or the continuity requirement.

Regarding the two-predicate-acts requirement, the King Defendants appear to make two general arguments, neither of which the Court finds persuasive. First, without citation, the King Defendants argue that where multiple predicate acts are simply constituent parts of the same scheme, there is no pattern of racketeering. They note that in *Jackson*, where the alleged fraudulent acts all related to settlement negotiations of a single lawsuit, the Eleventh Circuit found no pattern of racketeering activity. However, *Jackson* did not address whether the plaintiffs in that case had alleged two predicate acts; instead, it addressed whether they had established continuity. The King Defendants have cited no authority for their suggestion that a pattern can never be established where the predicate acts are

11. The King Defendants also argue that Murphy's conspiracy claims under the state and federal RICO statutes must fail for the same reasons as his other RICO claims.

12. Initially, the King Defendants contended that the Court should decline jurisdiction over any remaining state-law claims, but they withdrew this argument because the amended complaint alleges both federal question and diversity jurisdiction.

all in furtherance of the same scheme. Indeed, the Supreme Court seems to have rejected a similar argument. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (finding no support in the statute or its legislative history "for the proposition ... that predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes").

■ The King Defendants also note that "[c]ourts have been particularly unwilling to find a pattern of racketeering in allegations of abusive litigation." [38] at 14. In support, they note that the Eleventh Circuit has cautioned that "prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system." *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir.2002). But *Pendergraft* concerned the legal sufficiency of charges for extortion and mail fraud based on a threat to seek damages in a lawsuit against a governmental entity. Although *Pendergraft* might speak to whether Murphy has sufficiently alleged the elements of the specific predicate acts of extortion and mail fraud, the King Defendants do not appear to expressly raise this argument in their motion.[13] Rather than attacking the

sufficiency of individual predicate acts, they make only the general argument that Murphy's RICO claims should be dismissed because they are related to abusive litigation.[14] Although the Court shares the King Defendants' concerns about permitting claims such as these to proceed under RICO, that in and of itself is not a basis for dismissal.

■ The Court now turns to the crux of the King Defendants' arguments with respect to the federal RICO statute—that Murphy has not sufficiently alleged continuity. Establishing a " 'pattern of racketeering' activity requires proof of something beyond the two predicate acts themselves. That something is the threat of *continuing* racketeering activity." *Jackson*, 372 F.3d at 1265 (quoting *Jones v. Childers*, 18 F.3d 899, 912 (11th Cir. 1994)). Continuity may be established in one of two ways. A plaintiff may prove closed-ended continuity by showing "a closed period of repeated conduct," or the plaintiff may prove open-ended continuity by showing "past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 241–42, 109 S.Ct. 2893).

■ Murphy alleges a pattern of racketeering that spans a three-year-plus period of time.[15] The predicate acts alleged in

---

13. In *Pendergraft*, 297 F.3d at 1205, the court cited to several civil RICO cases holding that "a threat to file a lawsuit, even if made in bad faith, is not 'wrongful' within the meaning of the Hobbs Act." Other courts have similarly recognized that "[a]busive or sham litigation does not constitute a RICO predicate act." *E. Sav. Bank, FSB v. Papageorge*, 31 F.Supp.3d 1, 13 (D.D.C.2014), *aff'd*, No. 14–7044, 2015 WL 5927052 (D.C.Cir. Oct. 9, 2015) (citing *Pendergraft* and a number of other cases); *but see La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, No. 06 CIV. 4404 CM GWG, 2014 WL 3610890, at *10 (S.D.N.Y. July 21, 2014) (concluding that lawsuits "constituted extortion for RICO purposes because Kraus and Caruso did not have a legitimate claim of right to the proceeds" claimed in them). Here, the allegations go beyond a threat to

file a lawsuit, and Murphy alleges extortion under state law, not federal law. Further, as discussed below, Murphy also alleges other predicate acts that do not directly involve abusive litigation.

14. In their reply brief, the King Defendants cite *Pendergraft* for the proposition that Murphy has not alleged facts supporting extortion or mail fraud. But as discussed above, at this time the Court will not consider arguments raised for the first time in the reply brief.

15. The King Defendants do not specify whether continuity focuses on the acts of the individual Defendants or on the racketeering acts as a whole, though their analysis does not appear to distinguish among Defendants. In their motion, the Beacham Defendants state

the complaint include attempted extortion, attempted bribery of a state court judge, kidnapping, wire fraud, and mail fraud. According to the complaint, "[a]ll of these crimes were perpetrated with the goals of placing illicit and undue pressure on Mr. Murphy and his wife to relinquish his claims" in the child custody litigation, "extorting a 'pay off' to Defendant Farmer and the Conflictineering Enterprise," and "enhancing the public profiles and revenue streams of" Defendants. [31] ¶ 14.

The King Defendants rely heavily on *Jackson* in support of their contention that Murphy has failed to established continuity. In *Jackson*, the Eleventh Circuit concluded that there was no closed-ended continuity in part because "the alleged racketeering activity was related to the settlement of a *single* lawsuit, and, notably, was not designed to perpetrate racketeering with respect to a *series* of cases." *Id.* at 1267. The court noted that schemes lasting less than a year generally cannot show closed-ended continuity, and "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Id.* The King Defendants contend that this case too concerns only a single scheme with a discrete goal, and therefore

the Court should find that there is no continuity.

Murphy distinguishes *Jackson* from the present litigation in several ways. As he points out, the scheme in *Jackson* stretched over only nine months, which is a much shorter period of time than the three-year-plus scheme alleged in this case. Murphy also contends that while *Jackson* involved the settlement of a single lawsuit, the allegations in the amended complaint encompass much more than that. He points to the three-and-a-half-year battle in the child custody litigation as well as the 2010 settlement of the malpractice litigation filed against Crouch, Michelle Murphy's former attorney, and the lawsuit filed against court reporter Nan Freeman in furtherance of Defendants' alleged scheme to bribe a state court judge.[16] Murphy also distinguishes this case from *Eastern Savings Bank, FSB v. Papageorge*, 31 F.Supp.3d 1, 12–13 (D.D.C.2014), which the King Defendants also cite. In that case, the court concluded that the plaintiff failed to plead a "pattern" of racketeering where the alleged pattern, which spanned several years, consisted of a single scheme, a single injury, and a single victim. Murphy argues that here, there is more than one victim of the scheme alleged in his complaint.[17] Murphy also contends that unlike the plaintiff

that their alleged racketeering activity does not satisfy the continuity requirement, and in response Murphy asserts that continuity focuses on the acts as whole. *See* [47] at 22 (citing *United States v. Church,* 955 F.2d 688, 693–94 (11th Cir.1992), where the court noted that it was "the association's long-term existence and regular way of doing business that poses the threat of continued racketeering activity" rather than "the length of the defendant's connection" with the enterprise). Because Defendants have not offered any arguments or authority to the contrary and the parties have not expressly raised this issue, the Court has applied Murphy's approach.

16. The Court is not convinced that the Crouch litigation should be considered for purposes of closed-ended continuity. Although this event might have sparked the creation of the enterprise, it does not appear that the enterprise had formed at this point, and Murphy does not allege any predicate acts arising out of this event.

17. Murphy asserts that the victims include the children, Michelle Murphy's former lawyer, a state court judge and his court reporter, the guardians ad litem appointed in the child custody litigation, the custody evaluators, and others.

in *Papageorge*, whose allegations focused exclusively on prior litigation, he has identified extensive extra-litigation conduct as part of the pattern of racketeering.

Having considered the arguments on both sides, the Court believes the question of whether Murphy has established closed-ended continuity is a close one. The scheme alleged here is longer than the scheme in *Jackson* and in *Ferrell v. Durbin*, 311 Fed.Appx. 253, 256 (11th Cir. 2009), where the court held that a scheme spanning approximately eighteen months did not establish closed-ended continuity because of "the scant allegations, the limited time frame, the single scheme and the existence of only two victims." Indeed, courts have found closed-ended continuity where the alleged scheme was shorter than this. *See Chesapeake Employers' Ins. Co. v. Eades*, 77 F.Supp.3d 1241, 1256 (N.D.Ga.2015) (finding allegations that the defendants committed multiple acts of mail and wire fraud over two years and two months adequate to survive a motion to dismiss). However, as the King Defendants point out, the scheme has a discrete goal that is explicitly tied to the child custody litigation. Additionally, Murphy appears to allege only six or seven predicate acts in support of his federal claims, a relatively small number over such a long period of time. Nevertheless, in comparison to many of the schemes involved in the cases cited by the King Defendants, the scheme here involved the commission of a larger variety of predicate acts, and the alleged victims include not only Murphy, the direct target of the scheme, but also others involved in the litigation.[18] Given

the length of the scheme, the variety of predicate acts and variety of victims, the Court concludes that Murphy has established a sufficient basis for closed-ended continuity to survive a motion to dismiss.[19] Therefore, the Court need not address open-ended continuity.

### 2. State Law Claims

The Georgia RICO statute was modeled after the federal RICO statute and contains similar language for a similar purpose. *See Williams Gen. Corp. v. Stone*, 279 Ga. 428,614 S.E.2d 758, 760 (2005).[20] Under the Georgia RICO statute, it is "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. § 16–14–4(b). Like the federal RICO statute, the Georgia RICO statute provides for a civil right of action. *See id.* at § 16–14–6(c). The King Defendants argue that Murphy's claims under the Georgia RICO statute fail for two reasons. First, they contend that these claims are precluded by Georgia's abusive litigation statute, which is the exclusive remedy under Georgia law for abusive litigation. Second, they argue that Murphy has failed to allege a pattern of racketeering activity under the Georgia RICO statute.

Georgia's abusive litigation statute provides that "[a]ny person who takes an active part in the initiation, continuation, or procurement of civil proceedings against another shall be liable for abusive litigation" if that person acts "[w]ith malice"

---

**18.** At the very least, the victims include the children as well as a state court judge and his court reporter.

**19.** The Court would be willing to revisit this issue as the case progresses and in the event that Defendants are able to successfully challenge some of the predicate acts.

**20.** Nevertheless, there are significant differences between the two statutes, including the fact that "Georgia does not require a showing of continuity to demonstrate a 'pattern of racketeering.'" *Chesapeake Employers' Ins. Co.*, 77 F.Supp.3d at 1256 (citing *Dover v. State*, 192 Ga.App. 429, 385 S.E.2d 417, 421 (1989)).

and "[w]ithout substantial justification." O.C.G.A. § 51–7–81. Malice "means acting with ill will or for a wrongful purpose and may be inferred in an action if the party initiated, continued, or procured civil proceedings or process in a harassing manner or used process for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based." *Id.* § 51–7–80. Wrongful purpose includes "[a]ttempting to unjustifiably harass or intimidate another party or witness to the proceeding" or "[a]ttempting to unjustifiably accomplish some ulterior or collateral purpose other than resolving the subject controversy on its merits." *Id.* And a proceeding is without justification if it is frivolous, groundless in fact or in law, or vexatious. *Id.*

The foregoing statute is the exclusive remedy for abusive litigation in Georgia. It provides that "no claim other than as provided in" that article or in O.C.G.A. § 9–15–14 "shall be allowed, whether statutory or common law, for the torts of malicious use of civil proceedings, malicious abuse of civil process, nor abusive litigation." *Id.* § 51–7–85. And it expressly states that it "is the exclusive remedy for abusive litigation." *Id.* Georgia courts have applied the exclusivity provision to exclude various tort claims based on the filing of abusive litigation. *See Meadow Springs Recovery, LLC v. Wofford,* 319 Ga.App. 79, 734 S.E.2d 100, 103 (2012) (concluding that claims against a law firm for, among other things, tortious interference with business and contractual relationships were preempted by O.C.G.A. 51–7–85 because they sought "damages solely for the conduct of counsel in pursuing litigation on behalf of their clients"); *Nairon v. Land,* 242 Ga.App. 259, 529 S.E.2d 390, 392 (2000) ("[A] plaintiff is precluded from filing a claim of either intentional or negligent infliction of emotional distress as a remedy for abusive litigation."); *Phillips v. MacDougald,* 219 Ga.App. 152, 464 S.E.2d 390, 396 (1995) (establishing precedent "precluding a claim of tortious interference as a remedy for the alleged improper or unwarranted filing of a lawsuit"). As the Georgia Court of Appeals has explained, the "proliferation of unnecessary causes of action for the alleged improper filing of lawsuits would have a chilling effect on the exercise by citizens of their right of access to the courts." *Phillips,* 464 S.E.2d at 395.

■ Georgia courts "look to the substance and not the style of a particular claim to determine whether it amounts to a claim for abusive litigation." *Meadow Springs Recovery,* 734 S.E.2d at 102; *accord Nairon,* 529 S.E.2d at 392 ("The gravamen of both emotional distress claims is the defendants' act of filing an abusive lawsuit."); *Phillips,* 464 S.E.2d at 395 ("Clearly, the tortious interference claim in the case sub judice is grounded on a contention that the lawsuit at issue was improperly filed being without legitimate legal foundation."). Here, the King Defendants argue that Murphy's claims are precluded by that statute because he "is essentially and indisputably claiming that Defendants engaged in abusive litigation tactics," and the "list of predicate acts consists exclusively of purportedly illegitimate court filings and alleged crimes designed to influence the custody proceedings." [38] at 20.

But Murphy contends that O.C.G.A. § 51–7–85 does not apply because he is not challenging mere abusive litigation. He argues that not one of the nine predicate acts alleged in the complaint depends on proof of a false accusation or frivolous position in litigation. He also contends that the acts he alleges are criminal acts that go beyond mere abusive litigation. In support, he cites several cases upholding convictions arising out of an attorney's or

law firm's criminal conduct in the course of litigation.

▆ The Court agrees with Murphy that lawyers are not automatically shielded from prosecution for criminal acts simply because those acts took place in the context of litigation. However, the question before the Court is not whether state or federal authorities could bring criminal charges against Defendants for the conduct alleged in the complaint. It is whether Murphy, a plaintiff in a *civil* action, may bring Georgia RICO claims for damages based on that conduct.

Neither party appears to cite any decisions concerning the application of the abusive litigation statute to RICO claims arising out of litigation. However, it appears that in at least one case, the Georgia Court of Appeals has concluded that the abusive litigation statute precluded RICO claims based on "a pattern of racketeering activity with predicate acts of perjury, forgery, and theft" where the wrongful acts "all occurred during litigation of [a] dispossessory action." *Slone v. Myers*, 288 Ga. App. 8, 653 S.E.2d 323, 327 (2007), *overruled on other grounds by Reeves v. Upson Reg'l Med. Ctr.*, 315 Ga.App. 582, 726 S.E.2d 544 (2012). In *Slone*, the plaintiffs alleged that the defendants continued with the dispossessory proceeding "knowing the evidence of unpaid rents to be forged," the swearing out of a dispossessory warrant and appearances in court "constituted perjury," and one of the defendants "committed theft by deception by making false statements during her deposition." *Id.*

▆ In this case, Murphy alleges a pattern of racketeering based on a variety of predicate acts, all with the alleged purpose of pressuring Murphy to relinquish his claims in the state child custody litigation and extracting extortionate payments from Murphy. However, the mere fact that the purposes of the alleged enterprise include litigation does not mean that the actions of the enterprise are covered by the abusive litigation statute. It appears to the Court that the statute is concerned with the abusive use of litigation for improper purposes, not the use of unlawful tactics to influence or stop what is alleged to be otherwise proper litigation. That said, the Court agrees with the King Defendants that to the extent the predicate acts are based on the use of court filings to threaten or extort victims, the abusive litigation statute provides a remedy for such actions.

Murphy alleges nine specific predicate acts in support of his Georgia RICO claim. Although all of these acts were allegedly taken to pressure Murphy to relinquish his claims in the child custody litigation, only a handful of them appear to involve the abusive use of litigation or process to achieve those goals. Acts like kidnapping and kidnapping for extortion, interference with child custody, and wire fraud arising out of the Beacham Defendants' statements are not directly connected to litigation and do not involve the use of litigation. Murphy also alleges that Defendants used threats and communications outside of the courtroom as well as motions, hearings, and other court filings in his acts or attempted acts of extortion, bribery, intimidation of a court officer, and influencing witnesses. It appears to the Court that actions involving the use of court filings and legal proceedings, such as the lawsuit against a judge's court reporter, motions to disqualify guardians ad litem, and briefs attacking a psychiatrist who testified in the litigation, all fall within the scope of the abusive litigation statute. However, the parties have cited no authority suggesting that the allegations involving extortionate demands or threats communicated by letters, emails, and other communications would fall within the scope of the abusive litigation statute. And because these acts do not involve the malicious initiation, contin-

uation, or procurement of civil proceedings, the Court concludes that they would not.[21]

The parties have not addressed the effect of the determination that Murphy is precluded from recovering for some but not all of the predicate acts. As with several of the other issues raised, the parties take an all-or-nothing approach. At present, the Court need not determine the precise effect of this determination because even without the predicate acts based on filing threatening or coercive motions and briefs, Murphy has alleged enough predicate acts to support a Georgia RICO claim.[22] This brings the Court to the King Defendants' next argument—that Murphy has failed to allege a pattern under Georgia law.

■■ The King Defendants argue that Murphy cannot establish a pattern of racketeering under Georgia RICO because the alleged conduct arises out of a single dispute. In support, they cite several Georgia cases concluding that a plaintiff had failed to establish a pattern of racketeering activity where all of the alleged conduct arose out of a single transaction. *See, e.g., Smith v. Chemtura Corp.*, 297 Ga.App. 287, 676 S.E.2d 756, 761–62 (2009) (concluding that plaintiffs failed to plead a pattern of two or more predicate acts where their allegations of kidnapping and false imprisonment both arose out of single transaction, a fire); *Raines v. State*, 219 Ga.App. 893, 467 S.E.2d 217, 219 (1996) (holding that "[t]he sale of timber from a single parcel of real property, by means of a single deed, in one isolated transaction," could not "be broken down into two predicate acts by separately charging the sale

and the filing of the deed"). There are two problems with the King Defendants' arguments.

First, although Murphy does not raise this issue, the Court notes that the King Defendants' arguments appear to be in conflict with the express language of the statute. The current version of the Georgia RICO statute defines "pattern of racketeering activity" to include "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." O.C.G.A. § 16–14–3(4)(A). This language was put into effect in 2001 in response to Georgia court decisions recognizing the "single transaction" defense to Georgia RICO claims. *See* 4 GA. JUR. BUSINESS TORTS AND TRADE REGULATION § 7:21 (discussing the 2001 amendment). Although many courts have continued to apply the single transaction defense, other judges in this district have recognized that the current language of the statute indicates that a pattern may arise out of a single transaction. *See Advanced Tech. Servs., Inc. v. KM Docs, LLC*, No. 1:11–cv–3121–TWT, 2011 WL 5870545, at *4 (N.D.Ga. Nov. 21, 2011) (reading "the plain language of the statute to define a 'pattern of racketeering activity' as 'at least two acts of racketeering activity in furtherance of *one* or more ... *schemes*, or *transactions*'" (quoting O.C.G.A. § 16–14–3(8)(A)); *see also Andert v. Branch Banking & Trust Co.*, No. 1:14–cv–01160–AT (N.D.Ga. May 7, 2015) (order denying mo-

---

**21.** Whether the initiation of false reports of child abuse could fall within this definition is a question that the parties have not addressed. For present purposes, the Court assumes that it would not.

**22.** The Court notes that the attempt to influence Dr. Nice and the mail, wire fraud, and extortion arising out of communications with Murphy's wife, appear to involve communications made by King outside of the courtroom.

tion for reconsideration), ECF No. 40, at 14–19 (concluding that despite courts' continued application of the pre–2001 language, the current language of the statute clearly defines "pattern of racketeering activity" to include "two predicate acts in furtherance of one incident, scheme, or transaction").

Second, even if the single transaction defense applies, the cases the King Defendants cite are distinguishable. Those cases involved a single event or a discrete transaction. Here, the racketeering activity is tied to a single purpose, but Murphy alleges a variety of separate criminal acts, ranging from extortion and intimidation of witnesses to kidnapping, in furtherance of that purpose. The Court agrees with Murphy that the acts alleged in the complaint constitute several separate events and transactions. For all of these reasons, the Court concludes that Murphy has alleged a pattern of racketeering activity under Georgia law.

### 3. Res Judicata and Other Arguments

 . The King Defendants also argue that Murphy's action is barred by res judicata. "Res judicata bars the filing of claims which were raised or could have been raised in an earlier proceeding." *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir.1999). Because the King Defendants argue that res judicata applies based on a Georgia state court judgment, the Court looks to Georgia law to determine the preclusive effect of any rulings. *See Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir. 2006).

 In Georgia, "[t]hree prerequisites must be met before res judicata will apply: (1) identity of the cause of action; (2) identity of the parties or their privies; and (3) previous adjudication on the merits by a court of competent jurisdiction." *Starship Enters. of Atlanta, Inc. v. Coweta Cty., Ga.*, 708 F.3d 1243, 1253–54 (11th

Cir.2013) (quoting *James v. Intown Ventures, L.L.C.*, 290 Ga. 813, 725 S.E.2d 213, 215 (2012)).

The King Defendants contend that all of the elements of res judicata are present here because the Superior Court of Coweta County issued a final judgment "on the merits of Defendants' conduct (at least up to that point)" when it found Defendants in contempt. [38] at 23. They note that the decision was appealable, and the parties are the same because Murphy is now suing the same parties against whom he obtained a contempt finding. While Murphy agrees that any final rulings in the child custody litigation are binding in this litigation, he argues that the contempt order only prevents the parties from re-litigating the question of whether Farmer and King should be held in contempt for Michelle Murphy's non-appearance at the contempt hearing. And Murphy argues that his RICO claims are not predicated on this event.

The Court agrees with Murphy. The state court did not adjudicate the claims that Murphy brings here, and there is no indication that Murphy could have raised his present claims in the state child custody proceedings. Thus, the Court is not convinced that Murphy's claims are barred by res judicata.

Finally, the King Defendants suggest that the Court should stay or dismiss this action based on the prior action pending doctrine. They note that under this doctrine, courts have recognized that "a court may stay or dismiss a later-filed action ... if two conditions are met: (1) there exists an identity of issues between the two actions and (2) the controlling issues in the later-filed action will be determined in the earlier-filed action." *Quality One Wireless, LLC v. Goldie Grp., LLC*, 37 F.Supp.3d 536, 541 (D.Mass.2014). This doctrine does not apply because Murphy

asserts entirely different claims in this case and in the child custody litigation, and there is no suggestion that the child custody litigation will resolve the issues raised in this case.

## C. Farmer's Motion to Dismiss

Farmer contends that the Court should dismiss Murphy's complaint under the *Younger* or *Rooker–Feldman* abstention doctrines. He also argues for dismissal based on res judicata, the abusive litigation statute and failure to establish a pattern, but the Court has already rejected these arguments above. Farmer further contends that the amended complaint fails to establish anything more than that Murphy and his wife "are displeased that their conduct has been exposed in the Superior Court of Coweta County." [37] at 4. Finally, Farmer challenges jurisdiction based on the amount in controversy, and although he has not actually filed a motion to transfer, he also asserts that the case should be transferred to the Atlanta division of this district.

Before discussing the arguments above, the Court notes that the bulk of Farmer's initial motion to dismiss, which he incorporates by reference into his motion to dismiss the amended complaint, is devoted to showing that Murphy and his wife are the real wrongdoers. Although Farmer might be able to raise some of these arguments after discovery in a motion for summary judgment, the Court may not consider factual challenges to the allegations in the complaint in deciding a motion to dismiss.[23] Instead, as noted above, the Court must accept as true the facts Murphy has pled in the complaint. The Court now turns to Farmer's other arguments.

■■■■ First, he argues that the Court should abstain from this case under *Youn-*

*ger* or *Rooker–Feldman*, but he has not shown that either of those doctrines applies to this case. The *Rooker–Feldman* doctrine "is confined to ... cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Farmer contends that the doctrine applies because the superior court "made numerous decisions related to the assertions that John Harold Murphy wishes this Court to use as additional" punishment. [37–1] at 5. He also asserts that the complaint "relies upon this Court reviewing the issues decided by" the superior court. *Id.* at 6.

But Farmer does not explain how Murphy is seeking to *challenge* any particular state-court judgment. Murphy does not challenge the contempt order issued by the state court, and that order is not central to his case. Similarly, although Farmer refers to documents filed in a legal malpractice case in state court, he does not point to any judgment in that case that Murphy is seeking to challenge. The fact that the complaint references state court proceedings and a contempt order issued by the state court is not sufficient to bring this case within the realm of the *Rooker–Feldman* doctrine.

■■■■ The Court is not convinced that *Younger* abstention applies either. The Supreme Court has asked the following questions to determine whether *Younger* abstention applies: "*first*, do [the state court proceedings] constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state in-

---

23. To the extent Farmer intends for the Court to convert his motion to dismiss into a motion for summary judgment, the Court notes that

Farmer has not pointed to undisputed evidence to support his positions.

terests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). Farmer is correct that "matters involving domestic relations and child custody implicate important state interests." *Davis v. Self*, 547 Fed.Appx. 927, 930 (11th Cir.2013). Indeed, courts have applied *Younger* abstention to dismiss claims for injunctive and declaratory relief that would invalidate ongoing custody proceedings in state court. *See id.* However, Murphy's complaint does not challenge the child custody proceedings or the related orders and judgments of the state court, and Farmer has not explained how this proceeding would interfere with the state custody proceedings. "[A]n essential part of the first *Middlesex* factor in *Younger* abstention analysis is whether the federal proceeding will interfere with an ongoing state court proceeding. If there is no interference, then abstention is not required." *31 Foster Children v. Bush*, 329 F.3d 1255, 1276 (11th Cir.2003).

■ As the Supreme Court has recognized, "federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Id.* at 1274 (quoting *Col. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Farmer has not demonstrated that this is an "exceptional" case in which the Court should abstain from exercising jurisdiction. *Id.*

■ Farmer also asserts that the amount in controversy is far less than $75,000. However, he offers no explanation for this, and it is clear to the Court that the complaint satisfies the amount-in-controversy requirement. In addition to treble damages and punitive damages, Murphy seeks compensatory damages for, among other things, unnecessary attorney's fees, payments to redress the public dissemination of falsehoods, medical care and monitoring of the children,[24] and damage to Murphy's personal and professional reputation.

Likewise, Farmer fails to support his venue argument. He argues that the case should be transferred from the Newnan division to the Atlanta division because he and Beacham live in Atlanta, and King lives in Florida. But as Murphy points out, the local rules requiring the action to be brought in a division where a defendant resides only apply when all of the defendants reside in Georgia. Local Rule 3.1.B(3) states that "[a]ny civil action brought in this district on the grounds that the cause of action arose here must be filed in a division of the district wherein the activity occurred." The Court therefore denies Farmer's implied motion to transfer.

### D. The Beacham Defendants' Motions to Dismiss

Murphy accuses the Beacham Defendants of several criminal acts in connection with the videotaped interview of the children in the Virgin Islands and in connection with allegedly false statements that they made at town hall meetings, on the radio, and on the My Advocate Center website. In their motions to dismiss, the Beacham Defendants challenge the sufficiency of certain predicate acts involving them. They also argue that Murphy's federal RICO claims fail because he failed to establish an enterprise, two predicate acts that satisfy the statute, or continuity. And

---

24. Murphy alleges that the children's placement in a residential treatment facility alone resulted in out-of-pocket damages of approximately $200,000. *See* [31] ¶ 85.

they contend that Murphy has failed to state a defamation claim against them.

### 1. Challenges to Individual Predicate Acts

 "In order to survive a motion to dismiss in a civil RICO case, a plaintiff must show a 'pattern of racketeering activity' by alleging that the defendants committed two qualifying predicate acts." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1087 (11th Cir.2004) (per curiam) (quoting *Republic of Panama*, 119 F.3d at 948–49). In doing so, the plaintiff must "allege facts that support each statutory element of a violation of one of the state or federal laws listed in 18 U.S.C. § 1961(1)." *Id.* The Beacham Defendants argue that Murphy has failed to plead at least two predicate acts in support of his state and federal RICO claims against them.

### a. Interference with Custody

The Beacham Defendants argue that the crime of "interference with custody" in violation of O.C.G.A. § 16–5–45 cannot constitute a predicate act for purposes of the Georgia RICO statute because misdemeanors are not included within the definition of racketeering activity under the Georgia RICO statute.[25] *See Byrne v. Nezhat*, 261 F.3d 1075, 1113 (11th Cir.2001) (noting that when interpreting the catch-all provision in the definition of racketeering activity, in *Clark v. Security Life Insurance Co.*, 270 Ga. 165, 509 S.E.2d 602, 605 (1998), the Georgia Supreme Court held that misdemeanors are not included in the definition). The Beacham Defendants note that the first two offenses under O.C.G.A. § 16–5–45(2) are misdemeanors. Thus, they conclude that even if Murphy has sufficiently alleged that they committed this crime, it cannot serve as a predicate act for purposes of the Georgia RICO statute. Murphy disagrees, noting that the Georgia RICO statute specifically

includes as predicate acts "[k]idnapping, false imprisonment, and related offenses in violation of Article 3 of Chapter 5 of this title," O.C.G.A. § 16–14–3(5)(A)(vi), and the statute prohibiting interference with custody is within Article 3 of Chapter 5.

In *Byrne*, the Eleventh Circuit grappled with a similar question when deciding whether the battery alleged in that case could constitute a predicate offense under Georgia's RICO statute. The court noted racketeering activity was defined to include a crime "in Article 2 of Chapter 5, relating to bodily injury," which could include battery, but "the precatory language at the beginning of the definition clearly states that racketeering activity constitutes 'any crime which is chargeable by indictment.'" *Byrne*, 261 F.3d at 1113 (quoting O.C.G.A. § 16–14–3(9)). Given the unwillingness of the Georgia Supreme Court to import misdemeanor conduct into the definition of racketeering activity in *Clark*, the Eleventh Circuit seemed to think that only felonies, which "must be charged by indictment," would fall within the definition of racketeering activity. *See id.* ("If 'chargeable by indictment' means *may* be charged by indictment, every crime would constitute racketeering activity. We do not think the scope of Georgia RICO is so broad."). However, as Murphy points out, the court did not ultimately reach a holding on this issue. *See id.* at 1114 (noting that "the question of whether Georgia RICO's definition of racketeering activity includes the misdemeanor of simple battery" was not necessary to its decision and was "better left to the Georgia courts"). Instead, the court simply found that Georgia RICO did not "include the type of isolated, simple battery alleged in [that] case." *Id.* Taking guidance from *Byrne*, the Court concludes that it need not decide this issue now because even if

---

**25.** Murphy does not rely on this act in sup- port of his federal RICO claims.

interference with child custody does not constitute racketeering activity, Murphy has alleged other predicate acts that do.

### b. Kidnapping

The Beacham Defendants also argue that Murphy's allegations do not establish the crime of kidnapping for extortion under Virgin Islands law, which provides:

Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from any person or entity any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of kidnapping for ransom and shall be imprisoned for life.

14 V.I.C. § 1052(a). They note that the Third Circuit has looked to the following four factors to determine whether a person has engaged in kidnapping under Section 1052:

(1) the duration of the detention or asportation; (2) whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation which occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Gov't of Virgin Islands v. Berry*, 604 F.2d 221, 227 (3d Cir.1979).

The Beacham Defendants argue that there is only a conclusory allegation that Beacham "enticed" and "detained" the children so that she could conduct the videotaped interview and that there are no specific factual allegations that she threatened them or used force or that she held the children against their will. Additionally, there is no allegation about the length of time the children were in the van, and there is no indication that Murphy even knew the children were gone until the video surfaced.[26] Further, there is no allegation that Beacham committed a separate offense under Virgin Islands law (only that she was violating Georgia law), and there is no allegation that she held the children hostage while seeking ransom.

As Murphy argues, there is no requirement in the statute that the perpetrator of the crime use threats or force or that he or she seek ransom. The statute prohibits detention "to commit extortion or to extract from any person or entity any money or valuable thing." 14 V.I.C. § 1052. Unlike in *Berry*, there is no argument here that the detention was inherent in the commission of another crime. And Murphy argues that the Beacham Defendants violated the statute because they detained the children to further their extortionate objectives.

The Beacham Defendants argue that Murphy's extortion allegations are not sufficient because there is no allegation that they sought to obtain or actually obtained any property from Murphy. Specifically, they argue that there is no allegation that they advocated for Farmer to be paid or that they would receive any money if he was, and there is no obvious benefit to the Beacham Defendants from Michelle Murphy gaining custody of her children. But Murphy explicitly alleges that the enterprise intended to use Beacham's video to pressure Murphy into giving up his child custody claims and making "a shakedown payment." The Court is not aware of any requirement that Murphy specifically

---

**26.** The Beacham Defendants also note that Murphy does not allege the exact date of the alleged kidnapping, but this is not required to establish the elements of the offense.

plead that the Beacham Defendants would receive a portion of any payment in order to show that they participated in the extortionate scheme. But even if the allegations fail to support kidnapping for extortion, the Beacham Defendants have not shown that the allegations fail to state a claim under federal law.

■ A person violates 18 U.S.C. § 1201(a) when he or she "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person" when "the person is willfully transported in interstate or foreign commerce ... or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." The Beacham Defendants contend that Murphy's allegations of kidnapping under federal law fail because there is no allegation that Beacham held the children for ransom or reward or that she transported them in interstate commerce.

As to their first contention, the statute covers an individual who holds a person "for ransom or reward *or otherwise.*" *Id.* (emphasis added). The Eleventh Circuit has interpreted this language quite broadly. *See United States v. Adams,* 83 F.3d 1371, (11th Cir.1996) (noting the legislative history behind the addition of "or otherwise" and that the statute does not require that the kidnapping be committed for an illegal purpose). Murphy argues Beacham "otherwise" sought financial gain in the form of a shakedown payment and an increase in her profile. As to the Beacham Defendants' second contention, the victim need not be transported in interstate commerce if the offender travels in interstate or foreign commerce to commit the kidnapping. In this case, Murphy alleges that Beacham traveled to the U.S. Virgin Islands to commit the act; that is suffi-

cient to satisfy the interstate commerce element. Thus, the Beacham Defendants' arguments regarding the allegations of federal kidnapping are without merit.

### c. Interstate Travel in Aid of Racketeering Enterprise

A person violates the Travel Act, 18 U.S.C. § 1952(a), when he or she "travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to," among other things, "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" and thereafter performs or attempts to perform such an act." The Travel Act defines "unlawful activity" to include extortion or bribery. *Id.* at § 1952(b). The Beacham Defendants note that "RICO and the Travel Act require that a predicate act involving extortion must involve conduct which is 'capable of being generically classified as extortionate.'" *Cintas Corp. v. Unite Here,* 601 F.Supp.2d 571, 578 (S.D.N.Y. 2009), *aff'd,* 355 Fed.Appx. 508 (2d Cir.2009) (quoting *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 409, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003)). They appear to argue that the extortion alleged in the complaint do not satisfy this requirement.

But the Beacham Defendants do not explain why the alleged conduct does not fall within the definition of extortion. As they point out, the Supreme Court has recognized the following generic definition of extortion: "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Scheidler,* 537 U.S. at 410, 123 S.Ct. 1057. Murphy alleges that the Beacham Defendants engaged in racketeering acts to coerce him into abandoning his claims in the child custody case and paying off the enterprise. The Beacham Defendants have failed to explain how these allegations

are inadequate and have therefore failed to show that Murphy's claims based on the Travel Act are insufficient.

#### d. Wire Fraud

██ To establish wire fraud in violation of 18 U.S.C. § 1343, Murphy must allege that the defendants "(1) intentionally participated in a scheme to defraud; and (2) used wire communications to further that scheme." *United States v. Ross,* 131 F.3d 970, 984 (11th Cir.1997) (quoting *United States v. Brown,* 40 F.3d 1218, 1221 (11th Cir.1994)). The Beacham Defendants argue that Murphy's allegations regarding a scheme to defraud are conclusory, and even if he has alleged a scheme to defraud, he has not alleged that money or property was the object of that scheme. They note that the complaint alleges that the object of the scheme is to have "the accused persons relinquish their claims and to increase the visibility, profile, and revenue of My Advocate Center." [31] at 146.

But the very allegation that the Beacham Defendants used false statements to increase the revenue of My Advocate Center appears to allege that money was an object of the scheme. Murphy argues that there are two sets of victims—the clients and donors who support My Advocate Center and the case litigants targeted by the Beacham Defendants' defamation who face undue pressure to relinquish their claims or capitulate to unjust demands. In their reply brief, the Beacham Defendants argue that Murphy has not been injured by any misrepresentations regarding the size and influence of My Advocate Center, and therefore he cannot establish the required nexus between the predicate acts and an injury. Although this argument appears quite persuasive, the Court does not consider it because the Beacham Defendants did not raise it in their motion.

#### 2. Federal RICO Claims

The Beacham Defendants argue that Murphy's federal RICO claim fails because he fails to allege two predicate acts that satisfy the statute; he fails to allege sufficient facts establishing an enterprise; and he fails to sufficiently allege continuity. The Court has already addressed their challenges to specific predicate acts. Regarding Murphy's enterprise allegations, they argue that he "provides no allegation that King and the Advocate Defendants were part of the enterprise at the same time." [40] at 19. But the Beacham Defendants cite no authority to show that all defendants must be members of the enterprise at the same time. Indeed, the Eleventh Circuit has stated that "[t]he law does not require all members of the RICO enterprise to have maintained their association with it throughout the enterprise's life." *United States v. Hewes,* 729 F.2d 1302, 1317 (11th Cir.1984).

#### 3. Defamation Claims

██ Murphy alleges that Beacham published numerous defamatory statements against him, his wife, and others in town hall meetings, on the My Advocate Center website, in social media, and in radio broadcasts. The Beacham Defendants contend that Beacham's statements are not defamatory because she is stating an opinion that cannot be proven false.[27]

██ The Georgia Court of Appeals has held that a statement via radio or television broadcast must be "both false and malicious" to be actionable. *See Jaillett v. Ga. Television Co.,* 238 Ga.App. 885, 520 S.E.2d 721, 724 (1999) (quoting *Speedway Grading Corp. v. Gardner,* 206 Ga.App.

---

27. They also argue that Murphy does not specify the false statements, but Murphy points to specific paragraphs of the complaint that list several of the alleged defamatory statements.

439, 425 S.E.2d 676 (1992)). A statement of opinion may be actionable but only if it implies that the speaker is aware of additional defamatory facts not disclosed in the broadcast. "The pivotal questions are whether [the challenged] statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false." *Id.* at 725–26 (quoting *Eidson v. Berry,* 202 Ga.App. 587, 415 S.E.2d 16, 17 (1992)). The Beacham Defendants argue that all of the allegedly defamatory communications were targeted at audiences who are interested in the point of view of Michelle Murphy and others who believe the legal system does not always work fairly. They contend that the allegations about Beacham sharing her own story underscore that her statements were her opinion.

Murphy argues that Beacham's statements state and imply defamatory facts about Murphy. In support, he points to statements that Murphy "purchased" the children, that he "paid" custody experts "to ensure the case turns out a certain way," that the professionals involved in the litigation were "engaged in trafficking of children" and were "known for abandoning children, falsifying reports, committing perjury, and participating in fraud," that facts were being misrepresented to the higher courts, and that "there are millions of dollars at stake in taxes that won't have to be paid if" the children are living in the Virgin Islands. [47] at 23 n.14 (quoting from the complaint and exhibits). In their reply brief, the Beacham Defendants offer a number of arguments in support of dismissing the defamation claims, but most of those arguments were raised for the first

time and are not supported by citations to relevant authority.[28] Regarding the arguments raised in their motion, the Beacham Defendants refer to Beacham's statements as "hyperbole" and contend that even if the statements to which Murphy points could be read to be directed at Murphy, they are not actionable assertions of objective facts about him or his actions.

Although the parties have not offered any detailed discussion of this issue, the Court agrees with the Beacham Defendants that some of the statements Murphy references in his complaint might be hyperbole. In the context of broadcasts and articles about the child custody litigation, statements that Murphy "purchased" the children and the suggestion that he and/or others involved in the child custody litigation were involved in "trafficking of children" could be construed as "the sort of loose, figurative language that no reasonable person would believe presented facts." *Horsley v. Rivera,* 292 F.3d 695, 702 (11th Cir.2002). However, at this stage the Court is not convinced that all of the statements necessarily constitute hyperbole or unactionable statements of opinion. For example, the Court does not see how the statement that Murphy paid custody experts to ensure the case turned out a certain way could be viewed as an opinion. Therefore, the Court will deny the Beacham Defendants' motions to dismiss the defamation claims.

## IV. Other Motions

### A. Motion to Appoint Guardian Ad Litem

 Farmer has moved for the Court to appoint a guardian ad litem for J.M. and T.M., the minor children of Plaintiff Mur-

---

**28.** Specifically, the Beacham Defendants contend that Murphy has perpetuated discussions about the litigation and attempted to censor those who support his ex-wife by filing this action, that most of Beacham's hyperbole is directed at the court system, not Murphy, that Murphy has sufficient access to respond to the alleged defamation in a public forum, and that Murphy's defamation claims are brought for an improper purpose.

phy and Michelle Murphy. Farmer argues that appointment of a guardian ad litem by this Court "became necessary once John Harold Murphy began migrating issues relating to the best interest of the children into what [he] maintains is the jurisdiction of this Court." *Id.* at 2–3. He contends that if the case remains, it is realistic to expect that claims will be brought against Murphy and his current wife and perhaps even against the guardian ad litem in superior court. And he asserts that litigation of such claims "will require the involvement of the minor children," and the children are therefore "due the protection of a guardian ad litem who exclusively protects their interest in this federal Court." *Id.* at 3. Farmer also suggests that the guardian ad litem appointed by the superior court is somehow corrupt or has failed to adhere to the applicable rules, yet he states that the appointment of a guardian ad litem is sought to represent the interests of the children in this case only. In his supporting memorandum, Farmer suggests that the guardian ad litem is needed to make sure Defendants have access to the testimony of the children. He also asserts that the children are entitled to due process and to protections under the First and Fourth Amendments.

In their briefs, Farmer and Murphy delve into various accounts of the proceedings in state court and the appointment of a guardian ad litem by that court. They also accuse one another of using this litigation for improper purposes. This Court will not engage in the parties' acrimonious dispute over matters that have no bearing on the issue before the Court. The question for the Court is whether Farmer has

established a basis for the appointment of a guardian ad litem in this Court at this time, with respect to this lawsuit. He has not.

Farmer asks the Court to appoint a guardian ad litem pursuant to Federal Rule of Civil Procedure 17. Rule 17(c)(2), which provides that the Court "must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action." As Murphy points out, this rule contemplates the appointment of a guardian ad litem for minor *parties*. J.M. and T.M. are not parties to this lawsuit. The Court recognizes that there might be cases in which it is appropriate to appoint a guardian ad litem for a nonparty, but it is convinced that this is not one of them.

Farmer has not sufficiently explained what interests the children have in this litigation or why the appointment of a guardian ad litem would be needed to protect those interests.[29] Further, Farmer represents himself, not the children, and although he suggests that the absence of a guardian ad litem appointed by this Court could impede discovery, he does not explain how. To the extent Farmer disagrees with the state court's decisions, this Court has no basis for second-guessing those decisions. In short, because Farmer has provided no basis for the appointment of a guardian ad litem at this stage of the case, and the Court can discern none, it will deny his motion.[30]

 In his opposition to Farmer's motion for appointment of a guardian ad litem, Murphy also moved for sanctions against Farmer pursuant to 28 U.S.C.

---

**29.** The Court does not dispute that minors are entitled to basic constitutional protections. However, Farmer has failed to show how those protections necessitate the appointment of a guardian ad litem in this case.

**30.** Farmer requests an evidentiary hearing, but because he has shown no colorable basis for appointing a guardian ad litem and has offered no explanation for why a hearing is necessary, that request is denied.

§ 1927, which provides that an attorney "who so multiplies proceedings in any case unreasonably and vexatiously may be required by the court to satisfy" the costs, fees, and expenses incurred because of that conduct.[31] Courts employ an objective standard when examining attorney conduct and impose sanctions "when the attorneys' conduct is so egregious that it is 'tantamount to bad faith.'" *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir.2010) (quoting *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir.2007)). Murphy argues that the lack of legal authority supporting Farmer's motion and the appearance that it was filed to intimidate Ms. Harwell, the state-court-appointed guardian ad litem for the children, show that sanctions are warranted. Although the Court agrees with Murphy that Farmer's motion was lacking in supporting authority, the Court declines to sanction Farmer at this time. However, the Court will take this opportunity to advise all parties that motions and other filings in this case are not be used for the purpose of harassment, intimidation, or grandstanding. If the Court determines that a party is making filings for improper purposes, or if a party files a motion without any support for the relief requested, the Court will impose serious sanctions.

### B. The Beacham Defendants' Motion to Strike

■ The Beacham Defendants have moved to strike paragraphs 197219 and 309–317 of the amended complaint. The first section concerns Beacham's background, her own divorce proceedings, and her operation of My Advocacy Center. The second section concerns *pro se* lawsuits that Beacham has filed.

■ Federal Rule of Civil Procedure 12(f) permits the Court to "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." However, "[m]otions to strike are generally viewed with disfavor and are 'often considered time wasters.'" *TracFone Wireless, Inc. v. Zip Wireless Products, Inc.*, 716 F.Supp.2d 1275, 1290 (N.D.Ga.2010) (quoting *Tingley Sys., Inc. v. Bay State HMO Mgmt., Inc.*, 833 F.Supp. 882, 884 (M.D.Fla.1993)). "A motion to strike is 'a drastic remedy to be resorted to only when required for the purposes of justice ... [and] should be granted only when the pleading to be stricken has no possible relation to the controversy.'" *Id.* (quoting *Stephens v. Trust for Pub. Land*, 479 F.Supp.2d 1341, 1346 (N.D.Ga.2007)).

The Beacham Defendants argue that because the subject events took place before the Beacham Defendants allegedly joined the enterprise, they have no bearing on the current litigation. In other words, they argue that the allegations are immaterial or impertinent. They also contend that the allegations are prejudicial to Beacham because they are designed to embarrass and humiliate her.

The Court agrees with Murphy that allegations concerning Beacham's operation of My Advocate Center are relevant to his wire fraud claims. The Court will not strike these allegations. The relevance of the remaining allegations concerning Beacham's divorce and her pro se motions is questionable, and Murphy states that he does not oppose striking them for now without prejudice to him potentially seeking re-inclusion after discovery. The Court therefore strikes paragraphs 198–203 and 309–17.[32] If appropriate, Murphy

---

31. As Murphy points out, Farmer did not file any response or opposition to the motion for sanctions.

32. Because paragraph 197 concerns Beacham's educational background and is thus relevant to the wire fraud allegations, the Court has not struck this paragraph.

may seek re-inclusion of these paragraphs after discovery.

### C. Motion to Stay Discovery

The Beacham Defendants filed a motion to postpone the discovery conference and to stay discovery pending ruling on the motions to dismiss. The parties held their discovery conference shortly after the filing of the motion, rendering this portion of the motion moot. Shortly thereafter the King Defendants joined the Beacham Defendants' motion to stay discovery, and Farmer and Murphy indicated that they did not oppose the motion. Based on the docket, it does not appear that the parties have conducted any discovery during the pendency of the motions to dismiss. The Court therefore grants that motion *nunc pro tunc*.

### V. Conclusion

For the reasons stated above, the Court hereby denies Defendants' motions to dismiss the initial complaint and the amended complaint [11, 13, 23, 24, 36, 37, 38, 40 & 41], Farmer's motion to appoint a guardian ad litem [34], and Murphy's motion for default [46]. The Court grants in part and denies in part the Beacham Defendants' motion to strike [39], Murphy's motion to strike [60], and the motion to stay discovery [42 & 52].

IT IS SO ORDERED this 31st day of March, 2016.